UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DR. NORMAN S. MILLER,

      Plaintiff,

                                      File No.  1:08-cv-279

v.

                                      HON. ROBERT HOLMES BELL

MICHIGAN STATE UNIVERSITY, et al.,

      Defendants.
                                            /

**O P I N I O N**

This matter is before the Court on a motion for summary judgment filed by Defendants Michigan State University ("MSU"), Michigan State University College of Human Medicine, the Department of Psychiatry at the Michigan State University College of Human Medicine, Dr. Jed Magen, Dr. Glenn Davis, Dr. Marsha Rappley, Dr. Lou Anna K. Simon, and Dr. Kim Wilcox. (Dkt. No. 21.)  Plaintiff Dr. Norman S. Miller has also filed a motion for leave to file an amicus brief on behalf of the Michigan State chapter of the American Association of University Professors.  (Dkt. No. 45.)

I.

Plaintiff was employed by Defendant MSU as a professor of addiction medicine beginning in 1998 until August 2005.  (Dkt. No. 1, Compl. ¶¶ 16-17, 25.)  Defendants are employees of MSU, or colleges that are part of MSU.  Plaintiff brought this action seeking reinstatement to his position and damages, based on nine separate counts, including

violations of his Constitutional rights pursuant to 42 U.S.C. § 1983, as well as breach of contract and other state law claims.

## II.

In his summary judgment briefing, Plaintiff indicates that he is voluntarily dismissing certain of his claims and is maintaining suit only for his claims of violation of his rights under the First and Fourteenth Amendments, and his state law claims for breach of contract and wrongful discharge. (Dkt. No. 40, Pl.'s Resp. in Opp'n to Mot. for Summ. J. 5.) A request to voluntarily dismiss claims is, in effect, a request to amend the complaint, which is governed by Rule 15 of the Federal Rules of Civil Procedure. *See* 9 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2362 (West. 2009) (distinguishing voluntary dismissal of an "action" pursuant to Rule 41 and noting that "[a] plaintiff who wishes to drop some claims but not others should do so by amending his complaint pursuant to Rule 15."). Because a responsive pleading has been served in this matter, Plaintiff may amend his complaint only with the other parties' written consent or with leave of the Court. Fed. R. Civ. P. 15(a)(2). The Court should "freely give [such] leave when justice so requires." *Id.* Defendants' motion for summary judgment seeks adjudication of all of Plaintiff's claims; however, Defendants have not objected to Plaintiff's request for voluntary dismissal of some of the claims. In fact, Defendants apparently urge the Court to accept Plaintiff's request. In their reply to Plaintiff's summary judgment briefing, Defendants reference Plaintiff's voluntary dismissal and argue that Plaintiff's only pending claims are

his First and Fourteenth Amendment claims and his state law claims for breach of contract and wrongful discharge. (Dkt. No. 43, Defs.' Reply in Support of Mot. for Summ. J. 1 & n.2.) Thus, the Court will grant Plaintiff's request for voluntary dismissal, and will dismiss Counts I, V, VII, VIII, and IX. Remaining for summary judgment are Counts II (violation of Due Process under the Fourteenth Amendment), III (violation of the First Amendment), VI (breach of contract), and X (wrongful discharge).[1]

### III.

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. In evaluating a motion for summary judgment the Court must look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party. *Minges Creek, L.L.C. v. Royal Ins. Co. of Am.*, 442 F.3d 953, 955-56 (6th Cir. 2006) (citing *Matsushita*, 475 U.S. at 587). In order to defeat a summary judgment motion, the nonmoving party "must show sufficient evidence to create a genuine issue of material fact." *Prebilich-Holland v. Gaylord Ent. Co.*, 297 F.3d 438, 442 (6th Cir. 2002) (citing *Klepper v. First Am. Bank*, 916 F.2d 337, 342 (6th Cir. 1990)). The nonmoving party must provide more than a scintilla of evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

---

[1] There is no Count IV in the complaint.

242, 252 (1986).  In other words, the nonmoving party must present evidence sufficient to permit a reasonable jury to find in its favor. *Id.*  Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

**IV.**

Plaintiff was offered a position as a professor of addiction medicine in the "Health Programs" (HP) faculty appointment track in May 1998.  (Pl.'s Ex. 3.)  Defendants renewed Plaintiff's appointment in 2001 and 2003.  (Defs.' Exs. 2, 3.)  In April 2004, Defendant Dr. Jed Magen, acting chair of the Department of Psychiatry, sent Plaintiff a letter informing him that there was a "very low likelihood" that Plaintiff's current contract with MSU, which was to end in August 2005, would be renewed because of the "bad fit" between Plaintiff and the Department of Psychiatry.  (Pl.'s Ex. 4.)  In August 2004, Defendant Magen sent Plaintiff a summary of Plaintiff's performance review, noting, among other things: that Plaintiff had not received any grant funding, that students had complained about Plaintiff's failure to supervise, that course coordinators requested that Plaintiff not teach, and that Plaintiff "took most of the summer off" to study for the bar exam.  (Pl.'s Ex. 5.)  In a subsequent letter dated April 2005, Defendant Magen informed Plaintiff that his contract would not be renewed. (Pl.'s Ex. 6.)  Plaintiff appealed this decision through MSU's internal grievance procedures. A hearing panel found in favor of MSU in October 2005.  (Pl.'s Ex. 7.)  The Provost

concurred with this decision on appeal. (Pl.'s Ex. 8.) On further appeal, an appellate panel found in favor of Plaintiff and recommended his reinstatement. (Pl.'s Ex. 9.) On May 30, 2006, Defendant Dr. Lou Anna K. Simon, President of MSU, issued a letter rejecting the findings and recommendations of the appellate panel and upholding the decision to not reinstate Plaintiff. (Pl.'s Ex. 10.)

### A. Due Process Property Claim

To prevail on his claim that his Fourteenth Amendment Due Process rights were violated by Defendants' failure to reappoint Plaintiff to his faculty position, Plaintiff must establish three elements: "(1) that he has "a life, liberty, or property interest protected by the Due Process Clause of the Fourteenth Amendment," (2) that he was "deprived of this protected interest within the meaning of the Due Process Clause," and (3) "that the state did not afford [him] adequate procedural rights prior to depriving [him] of [his] protected interest." *Gunasekera v. Irwin*, 551 F.3d 461, 467 (6th Cir. 2009) (citations omitted). Defendants argue that Plaintiff has not presented evidence sufficient to raise a genuine issue of fact with respect to whether he had a protected property interest in continued employment.

In the employment context, property interests may derive from formal, written contracts or informal "'rules and understandings, promulgated and fostered by state officials . . .'" *Gunasekera*, 551 F.3d at 467 (quoting *Perry v. Sindermann*, 408 U.S. 593, 602-03 (1972)). Such interests may arise from the employer's "custom and practice." *Id.* at 468. Plaintiff argues that his property interest derives from a written contract with MSU entitling

him to reappointment if he met certain conditions. Alternatively, Plaintiff argues that he has a property interest in his continued employment based on "rules and understandings" fostered by Defendants.

In support of his claim, Plaintiff contends that, prior to accepting his position, he was told by Dr. Christoper Colenda that he would be reappointed after termination of his contract as long he satisfactorily performed his duties. (Compl. ¶ 29.) Plaintiff also relies upon a letter that he received in connection with his initial offer of employment, and appointment memoranda that he signed in connection with the renewal of his employment contract in 2001 and 2003. The offer letter, which is dated May 15, 1998, contains the following language:

> Your appointment would commence on or about August 1, 1998 and would extend through June 30, 1999. Initial HHP faculty contracts are for a period of 3 years, but are renewed annually dependent upon satisfactory performance of duties assigned.

(Pl.'s Ex. 2,[2] Offer Letter 2.) Plaintiff argues that, by this letter, he understood that he would be reappointed after the end of the three-year period if he performed his work satisfactorily. However, the foregoing merely indicates that renewal is "dependent" upon satisfactory performance. It does not state that MSU is obligated to renew his appointment if his performance is satisfactory; in other words, satisfactory performance is a necessary, but not necessarily sufficient, condition for renewal. Moreover, any expectation of renewal on the

---

[2] In this opinion, exhibits attached to Defendants' motion for summary judgment will be cited as "Defs.' Ex. __," and exhibits attached to Plaintiff's response to the motion for summary judgment will be cited as "Pl.'s Ex. ___."

basis of satisfactory performance alone is contradicted by the memorandum that Plaintiff signed when he accepted his initial term of appointment in 1998. The memorandum states:

> All HHP appointments have a specific termination date. The University has no obligation to provide reappointment or extension of a HHP appointment beyond the ending date.[3]

(Defs.' Ex. 1.) Plaintiff signed memoranda with identical language in 2001 and 2003, in connection with the renewal of his appointment in 2001 (for appointment through 2003) and in 2003 (for appointment through 2005). (Defs.' Exs. 2, 3.) The 2001 and 2003 memoranda also contain the following language, reiterating MSU's position that reappointment is not guaranteed:

> The HP appointment/reappointment, and any subsequent HP appointment recommended pursuant to the Michigan State University Policy on HP appointments does not constitute a commitment to an appointment in a continuing appointment system, tenure system or otherwise.

(*Id.*) Plaintiff also relies on a document attached to the 2001 memorandum, which states that:

> After the academic year 2001-02 performance evaluation, the Department will agree to a two year rolling HP contract beginning August 31, 2002. This is contingent upon satisfactory performance of assigned duties . . . .

(Defs.' Ex. 2.) Plaintiff contends that he believed, based on this document, that his contract was a "rolling contract" that would be renewed as long as his performance was satisfactory. The Court notes that neither this document, nor the 2001 memorandum, indicate what is meant by a "rolling HP contract." Moreover, in context, it appears that agreement to a rolling contract is contingent upon future performance. Any suggestion that, in 2001, Defendants

---

[3] The memorandum notes that the ending date is September 30, 2001. (Id.)

were obligated to renew Plaintiff's contract after the end of the 2001 appointment term is directly contradicted by language appearing in the immediately following paragraph, which is quoted *supra* and which states that Plaintiff's appointment has a "specific termination date" and that MSU is "not obligated to provide reappointment or extension of a HHP appointment beyond the ending date." (Defs.' Ex. 1.)

Even assuming that there existed an understanding in 1998 or 2001 that Plaintiff's contract would be renewed, based on Dr. Colenda's representations or based on the "rolling contract" language from the 2001 memorandum, Plaintiff signed a new memorandum in 2003. Plaintiff's reappointment memorandum from 2003 makes no reference to a rolling contract.[4] The 2003 memorandum also contains the aforementioned language regarding a specific termination date and the absence of any obligation by MSU to renew the appointment. (Defs.' Ex. 3.) Thus, if there existed any understanding in 2001 regarding renewal of Plaintiff's appointment, that understanding had clearly changed by 2003.[5]

Plaintiff also relies on language in the Health Programs Faculty Appointment System Handbook ("HPFASH"), a document that is referenced in the appointment memoranda. Plaintiff contends that HPFASH created a legitimate expectation of renewal of his

---

[4] The court also notes that the 2003 reappointment form shows several check boxes under the title "Appointment Status." The box "fixed term" is checked, while the boxes for "rolling fixed term" and "rolling contract" are not checked. (Defs.' Ex. 3.)

[5] Moreover, if the parties had understood that Plaintiff was subject to a two-year "rolling contract" beginning in 2002, then presumably Plaintiff's contract would have been up for renewal in 2004, and it would not have been necessary for Plaintiff to renew his contract in 2003.

appointment if he performed satisfactorily. However, nowhere in HPFASH does it indicate that HP faculty appointments will be renewed if performance is satisfactory; in fact, HPFASH clearly indicates that appointments might *not* be renewed *even if* a faculty member's performance is satisfactory. Sections 3.4 and 3.5 of HPFASH discuss the procedures and criteria for reappointment of the HP faculty. (Pl.'s Ex. 3, HPFASH.) Section 3.4 provides that departmental chairs make initial recommendations for reappointment to the Dean. (*Id.* at § 3.4.2.) The Dean makes his recommendations to the Provost, who makes the final decision. (*Id.*) Section 3.5 of HPFASH clarifies that:

> [A] [d]ecision not to recommend an additional appointment for a Health Programs Faculty *does not necessarily imply* that a faculty member has failed to meet the standards of the University with respect to academic competence and/or professional performance of his/her duties. This decision may be made, wholly or in part, upon the availability of salary funds and/or departmental or College needs.

(*Id.* at § 3.5) (emphasis added). Thus, according to HPFASH, satisfactory performance of duties is *not* sufficient for reappointment. The decision not to recommend reappointment may be based on the availability of funds or institutional "needs," *regardless* of the performance of the faculty member.

HPFASH also notes that, notwithstanding the recommendation from the department and the Dean, the final decision rests with the Provost. (*Id.* at § 3.4.2.) Nowhere in HPFASH is there any indication that the Provost's decision is constrained such that the Provost must reappoint HP faculty if certain criteria are satisfied. *See McClain v. Nw. Cmty. Corrs. Center Judicial Corrs. Bd.*, 440 F.3d 320, 330 (6th Cir. 2006) ("No constitutional

9

entitlement to procedural due process can logically arise when the decision-maker's power is wholly discretionary."); *Med Corp., Inc. v. City of Lima*, 296 F.3d 404, 410 (6th Cir. 2002) ("[I]n order to assert a property interest . . . [plaintiff] must point to some policy, law, or mutually explicit understanding that both confers the benefit and limits the discretion of the [defendant] to rescind the benefit."). Plaintiff has not submitted any evidence to show that the Provost's discretion to reappoint Plaintiff is limited such that Plaintiff had a legitimate expectation of reappointment.

Plaintiff also argues that his Health Programs ("HP") contract was part of a system that was intended to provide more rights and protection for continued employment than a fixed-term system. HPFASH explains that MSU created the HP faculty appointment system for the medical and nursing schools in order to fulfill a need not addressed by the fixed term and the tenure track systems:

> Since tenure system appointments are normally tied to continuing and stable revenues such as the general fund, the only option currently available to the Medical and Nursing Colleges for increasing the faculty resource base is the fixed term appointment system. This system, however lacks the definition, security structure and benefits essential to attracting and maintaining high quality clinical faculty members. As such a new appointment system must be developed . . . .

(*Id.* at § 0.2.) HPFASH also explains that the HP appointment system "is intended to be a separate personnel system with its own structure, not intended to replace the tenure system, [or the] fixed term system, . . . but to be in addition to those appointment structures." (*Id.* at § 0.1.) Thus, the medical and nursing colleges "are committed to a policy which defines the tenure system as the basic faculty appointment track," and the HP faculty system "is intended

as a supplement and not an alternative to the tenure system." (*Id.* at § 0.3.)

Plaintiff apparently contends that, because the HP faculty appointment system is distinct from the fixed-term system, the relevant distinction between the two programs is a right or expectation of continued employment at the end of the appointment term. However, Plaintiff does not point to any language in HPFASH, or any other evidence, that would give rise to such a right or expectation. Section 0.2 mentions the "definition, security structure, and benefits" lacking in a fixed term system, though there is no indication in HPFASH, or in any evidence offered by Plaintiff, that among the benefits of the HP appointment system, as compared to the fixed-term system, is a guarantee or likelihood of contract renewal at the end of a term of appointment.

According to HPFASH, one feature of the HP appointment system is that it "has been designed to assure that the individual appointed in this system will not be dismissed due to capricious action by the University, College or Department *prior to the ending date of the appointment.*" (*Id.* at § 1.1.) (emphasis added) However, HPFASH is conspicuously silent with respect to any assurances regarding reappointment.

Finally, Plaintiff has not offered any evidence to show that he has a protected property interest based on a "custom and practice" of Defendants. In *Gunasekera*, the Sixth Circuit permitted a Due Process claim to survive dismissal where the plaintiff, a university professor whose faculty status was suspended, alleged that a common practice and understanding had developed such that faculty would retain their status as long as they met certain criteria. 551

11

F.3d at 467-68. The court noted that the defendant admitted that it had never before revoked or suspended the faculty status at issue. *Id.* at 468. Plaintiff has offered no similar evidence regarding the Defendants' conduct. *See Dorr v. City of Ecorse*, No. 07-1604, 505 F. App'x 270, 276 (6th Cir. Dec. 29, 2008) ("Under § 1983, a practice or custom involves a widespread course of conduct . . . that has become a traditional way of carrying out policy.") While HPFASH may indicate Defendants' policies with respect to the reappointment of HP faculty generally, it does not support a contention that Defendants had a custom and practice of reappointing HP faculty as long as they meet certain criteria.

For the foregoing reasons, the Court concludes that Plaintiff has failed to submit evidence sufficient to raise a genuine issue of material fact with respect to whether he had a protectible property interest in reappointment. The Court will, therefore, grant summary judgment to Defendants with respect to Plaintiff's Fourteenth Amendment Due Process claim.

**B. First Amendment Retaliation Claim**

Plaintiff contends that his contract of appointment was not renewed in retaliation for his exercise of his First Amendment right to freedom of speech. Plaintiff is a specialist in addictive diseases. Plaintiff contends that Defendants disapproved of his opinions and teaching methods in this subject area. He asserts that Defendants "maintain pessimistic and negative views regarding the teaching of Addiction Medicine and the individuals who face this disease." (Pl.'s Br. in Opp'n to Mot. for Summ. J. 16.) He also asserts that "he believed

12

the general consensus of the faculty was that addiction medicine should not be taught in the College of Human Medicine." (*Id.*)  Plaintiff asserts that he "participated in curriculum development meetings and tried to increase and expand the teaching of addiction medicine to no avail." (*Id.*)  Plaintiff asserts that Defendants' bias towards addiction medicine is evident from the fact that "only three hours of lecture time" is devoted to addiction medicine "out of a four-year curriculum" and only "one week of clinical experience" out of "two years in College of Human Medicine . . . ." (*Id.* at 18.)

To establish a claim of retaliation based on the First Amendment, a plaintiff must show:

>    (1) the plaintiff was engaged in a constitutionally protected activity;
>
>    (2) the defendant's adverse action caused the plaintiff to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and
>
>    (3) the adverse action was motivated at least in part as a response to the exercise of the plaintiff's constitutional rights.

*Jenkins v. Rock Hill Local Sch. Dist.*, 513 F.3d 580, 585-86 (6th Cir. 2008).  Where a public employee claims that his constitutionally protected activity is speech, it must also establish "'(1) that the speech at issue addresses a matter of public concern, and (2) that the employer had no overriding state interest in efficient public service that would be undermined by the speech.'" *Murphy v. Cockrell*, 505 F.3d 446, 449 (6th Cir. 2007) (quoting *Silberstein v. City of Dayton*, 440 F.3d 306, 318 (6th Cir. 2006)).

Whether speech is a matter of public concern is a question of law.  *Miller v. Admin.*

*Office of the Courts*, 448 F.3d 887, 894 (6th Cir. 2006). The determination must be made by examining "the content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147-48 (1983). As Defendants indicate, in the instant case, there is no record to evaluate because Plaintiff has failed to submit any evidence of his speech. While there does not appear to be any dispute that Plaintiff was a professor of addiction medicine, and while the Court can infer that Plaintiff engaged in some speech in connection with this position, it does not necessarily follow that Plaintiff engaged in protected speech.[6] In the absence of any evidence of the speech for which Plaintiff claims he is entitled to protection, Plaintiff has failed to raise a genuine issue of fact as to whether he engaged in any constitutionally protected conduct.

Similarly, Plaintiff has not submitted any evidence supporting a causal connection between the decision not to renew his appointment and any protected speech on his part. Plaintiff asserts in an affidavit that he believed there was a "pattern of discrimination" against "those who teach addiction medicine" and that he believed there was a "general consensus of the faculty . . . that addiction medicine should not be taught." (Pl.'s Ex. 20, Aff. of Dr. Norman S. Miller.) However, Plaintiff offers no admissible evidence to support these

---

[6] In addition to the "public concern" requirement, the Court also notes that a public employee's speech made pursuant to official responsibilities cannot form the basis for a First Amendment claim of retaliation. *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006) ("[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."). Thus, to the extent that Plaintiff relies on his job-related teaching of addiction medicine as the "speech" supporting his First Amendment claim, it is unlikely that such speech would qualify for protection.

statements. "In order to establish that protected speech was a substantial or motivating factor [for the adverse action], the employee must point to 'specific, nonconclusory allegations reasonably linking her speech to employer discipline.'" *Everson v. Bd. of Educ. of Sch. Dist. of the City of Highland Park*, No. 03-2582, 123 F. App'x 221, 229 (6th Cir. Feb. 18, 2005) (quoting *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 144 (6th Cir. 1997)). The plaintiff "may not rely on the mere fact that an adverse employment action followed speech that the employer would have liked to prevent." *Id.* Plaintiff has not offered, for instance, evidence of incriminating statements or conduct on the part Defendants, or disparate treatment of similarly-situated individuals. Plaintiff's vague and conclusory statements are not sufficient to create a genuine issue of material fact as to whether any protected speech on the part of Plaintiff was a motivating factor in the decision by Defendants to not renew his appointment.

For the foregoing reasons, the Court concludes that Plaintiff's First Amendment claim fails as a matter of summary judgment.

**III.**

Having found in favor of Defendants on Plaintiff's First and Fourteenth Amendment claims, the other claims remaining in this action after dismissal by Plaintiff are Plaintiff's state law claims for breach of contract and for wrongful discharge in Counts VI and X of the complaint. The only asserted bases for subject matter jurisdiction in this action are federal question jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331, and

supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

The Sixth Circuit has instructed that "a federal court that has dismissed a plaintiff's federal-law claims should not ordinarily reach the plaintiff's state-law claims." *Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006). *See* 28 U.S.C. § 1367(c)(3) (allowing the district court to decline to exercise supplemental jurisdiction over a claim if it has dismissed all claims over which it has original jurisdiction); *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("[I]f the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."). Though there are factors favoring the Court's exercise of jurisdiction,[7] in the interest of comity, and in keeping with the "ordinary" rule, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims.

## IV.

Also before the Court is Plaintiff's motion to file an amicus brief on behalf of an unrepresented non-party, the MSU chapter of the American Association of University Professors. (Dkt. No. 45.) Plaintiff's motion does not indicate how the amicus brief would be helpful to the Court, and review of the proposed amicus brief indicates that it is not responsive to any issue before the Court. Plaintiff's motion will be denied.

---

[7] It appears that discovery in this matter is complete, and the matter is currently scheduled for trial in September. On the other hand, only one dispositive motion has been filed by the parties, and no hearings have been held on any dispositive issues.

An order will be entered that is consistent with this opinion.


Dated: June 30, 2009                    /s/ Robert Holmes Bell
                                        ROBERT HOLMES BELL
                                        UNITED STATES DISTRICT JUDGE